**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BENITO FLORES DELGADO, individually and as Special Administrator of the Estate of Juan Flores, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 1:18-cv-06378 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al. | ) | Honorable John F. Kness |
| | ) | |
| Defendants. | ) ) ) ) ) ) | |

## DEFENDANT CITY OF CHICAGO'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT AT LAW

Defendant City of Chicago ("City") by and through its attorney, Celia Meza, Corporation Counsel for the City of Chicago, submits the following answer, affirmative defenses, and jury demand to plaintiff's second amended complaint:

## INTRODUCTION

1.     This is an action for civil damages brought pursuant to 42 U.S.C. Sec. 1983 for the deprivation of Plaintiff's decedent's constitutional rights.

**ANSWER: Defendant City admits this action is brought pursuant to section 1983, but denies engaging in any misconduct or wrongdoing.**

2.     This Court has jurisdiction pursuant to 28 U.S.C §§1331, 1343, and 1367.

**ANSWER: Defendant City admits this Court has jurisdiction.**

3.     Venue is proper under 28 U.S.C § 1391 (b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

**ANSWER: Defendant City admits venue is proper in this district.**

1

## PARTIES

4.     Plaintiff's Decedent, JUAN FLORES, was an individual in the United States. He is represented in this action by BENITO FLORES DELGADO, his adult father and the Special Administrator of the Estate of JUAN FLORES on behalf of Benito Flores Delgado, individually and on behalf of Eva Cervantes his mother, Rocio Maria Flores, his minor sister, Graciela Flores, his minor sister, Edward Flores, his minor brother and Edwin Flores, his minor brother. BENITO FLORES DELGADO is the duly appointed Special Administrator of Plaintiff's Estate.

**ANSWER: Defendant City admits Juan Flores was, at all relevant times, an individual in the United States, but lacks knowledge or information sufficient to form a belief regarding the remaining allegations contained in this paragraph.**

5.     Defendants, Chicago Police Officer CLARENCE MCCOY ("MCCOY"), Chicago Police Officer CHARLES O'CONNOR ("O'CONNOR"), Chicago Police Officer JESSE OEINCK ("OEINCK") and Chicago Police Officer, RICHARD VITELLARO (' VITELLARO'), were at all times material hereto, duly appointed Chicago Police Officers employed by the CITY OF CHICAGO acting in the capacity of sworn law enforcement officials.

**ANSWER: Defendant City admits Chicago Police Officer Clarence Mccoy ("McCoy"), Chicago Police Officer Charles O'Connor ("O'Connor"), Chicago Police Officer Jesse Oeinck ("Oeinck") and Chicago Police Officer, Richard Vitellaro ("Vitellaro") were, at all relevant times, police officers employed by the City of Chicago and were acting as sworn law enforcement officers.**

6.     Defendant, the CITY OF CHICAGO (the "CITY") is, and at all times material hereto was a municipal corporation duly organized and existing under the laws of the State of Illinois, located in Cook County, Illinois.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

## FACTUAL SUMMARY

7.     On September 10, 2017, JUAN FLORES called 911 for help because the father of his girlfriend had a gun and had punched JUAN FLORES in the face.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

8.     Officers MCCOY and O'CONNOR arrived in uniform in a marked Chicago Police vehicle at or about 928 N. Kedvale Avenue, Chicago, Illinois 60651 in response to the 911 call.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

9.     JUAN FLORES was seated in his vehicle in the street when Officers MCCOY and O'CONNOR arrived.

**ANSWER:  Defendant City admits Juan Flores was on scene when Officers McCoy and O'Connor arrived but lacks knowledge as the remaining allegations contained in this paragraph.**

10.     JUAN FLORES' keys had been taken from him by someone at the 928 N. Kedvale address, so he did not have keys for his vehicle in his possession when the police arrived.

**ANSWER: Defendant City admits Juan Flores did not have keys on his person when the police arrived.  Defendant City lacks knowledge as to the remaining allegations contained in this paragraph.**

11.     Officer O'CONNOR went inside the resident to look for JUAN FLORES' keys.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

12.     Officer MCCOY directed and required JUAN FLORES and others to go with Officer MCCOY into the yard to look for JUAN FLORES' car keys.

**ANSWER: Defendant City admits Officer McCoy, Juan Flores, and others did go into the yard to look for Juan Flores' car keys, but denies the remaining allegations contained in this paragraph.**

13.     While looking for the car keys, the father of the girlfriend of JUAN FLORES told Officer MCCOY that JUAN FLORES was drunk. The father of the girlfriend of JUAN FLORES also told Officer MCCOY that JUAN FLORES should not be allowed to drive and that he would report Officer MCCOY unless he took action.

**ANSWER: Defendant City admits upon information and belief the allegations contained in this paragraph.**

14.     MCCOY spoke to JUAN FLORES' father, BENITO FLORES DELGADO on the telephone and Officer MCCOY told BENITO FLORES DELGADO that JUAN FLORES was drunk and that he should not drive.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

15.     MCCOY admitted that BENITO FLORES DELGADO told MCCOY that he was on his way there to get JUAN FLORES.

**ANSWER: Defendant City admits that Juan Flores' father told McCoy that he was on his way there to get Juan Flores.**

16.    Officer MCCOY was informed and/or made aware that Plaintiff's decedent was underage for consuming alcohol and was intoxicated by alcohol.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

17.    The keys were found and brought to Officer MCCOY.

**ANSWER:    Defendant City admits the allegation contained in this paragraph.**

18.    MCCOY is told that the car keys were found in FLORES' car.

**ANSWER:    Defendant City admits the allegation contained in this paragraph.**

19.    MCCOY instructed that the keys be put on the ground.

**ANSWER:    Defendant City denies the allegation contained in this paragraph.**

20.    MCCOY could have reasonable retained JUAN FLORES' car keys to prevent him from driving, but instead MCCOY instructed and directed JUAN FLORES, who MCCOY had admittedly been aware that JUAN FLORES was intoxicated, to pick up the car keys.

**ANSWER:    The allegations contained in this paragraph are related to counts dismissed in this Court's order at ECF No. 97.  To the extent this allegation requires an answer, Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

21.    MCCOY then escorted JUAN FLORES out to the street and car where MCCOY watched while JUAN FLORES got into the vehicle and drove away with no headlights on in darkness, reasonably believing that FLORES was underage and intoxicated.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

22.    MCCOY allowed and permitted JUAN FLORES to enter his vehicle, start the vehicle, and pull away in the vehicle even though MCCOY was operating under the assumption that JUAN FLORES was intoxicated and underage.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

23.    MCCOY could have stopped JUAN FLORES from leaving until JUAN FLORES' father, BENITO FLORES DELGADO, arrived to BENITO FLORES DELGADO could drive JUAN FLORES home.

**ANSWER: The allegations contained in this paragraph are related to counts dismissed in this Court's order at ECF No. 97.  To the extent this allegation requires an answer, Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

24. MCCOY could have detained JUAN FLORES to prevent him from leaving.

**ANSWER: The allegations contained in this paragraph are related to counts dismissed in this Court's order at ECF No. 97. To the extent this allegation requires an answer, Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

25. MCCOY could have arrested JUAN FLORES to prevent him from leaving.

**ANSWER: The allegations contained in this paragraph are related to counts dismissed in this Court's order at ECF No. 97. To the extent this allegation requires an answer, Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

26. MCCOY and his partner O'CONNOR, knowing that JUAN FLORES wanted to go home, was nonviolent, did not have a weapon, was upset, underage and intoxicated, did not notify any other officer over the radio that they had just allowed and permitted an intoxicated, fearful teenager to pick-up his car keys, and drive away with MCCOY watching.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

27. MCCOY and O'CONNOR knew that letting JUAN FLORES drive would be dangerous to himself and the public, and that giving JUAN FLORES information to dispatch to notify other officers would reduce that danger.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

28. MCCOY and O'CONNOR were caught on audio and video having a discussion between themselves indicating that they should not have escorted JUAN FLORES to his car and allow JUAN FLORES to drive off.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

29. JUAN FLORES deserved MCCOY and O'CONNOR'S best skill and attention, which required them to prevent JUAN FLORES from leaving and drive while intoxicated.

**ANSWER: Defendant City answers that the allegations contained in this paragraph are vague and ambiguous, causing Defendant City to lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph. Answering further Defendant City denies the allegations contained in this paragraph to the extent they purportedly set forth any legal duty.**

30. JUAN FLORES deserved MCCOY and O'CONNOR'S best skill and attention, which required them to inform other officers about the potential danger JUAN FLORES posed to himself and the public.

**ANSWER: Defendant City answers that the allegations contained in this paragraph are vague and ambiguous, causing Defendant City to lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph. Answering further Defendant City denies the allegations contained in this paragraph to the extent they purportedly set forth any legal duty.**

31.     JUAN FLORES deserved MCCOY and O'CONNOR'S best skill and attention but did not receive it.

**ANSWER: Defendant City answers that the allegations contained in this paragraph are vague and ambiguous, causing Defendant City to lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph. Answering further Defendant City denies the allegations contained in this paragraph to the extent they purportedly set forth any legal duty.**

32.     The preceding events discussed in the paragraphs above were willful and wanton and proximately lead to the injury and death of JUAN FLORES and were caught on audio and video through MCCOY'S body camera.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

33.     After FLORES drove off in his vehicle, Plaintiff's vehicle was seen driving with no headlights by Officers VITELLARO and JESSE OEINCK.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

34.     Officers VITELLARO and JESSE OEINCK could have known that Plaintiff was intoxicated, underage, upset, nonviolent and probably heading home if Officers MCCOY and O'CONNOR had put that information over the radio.

**ANSWER: Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

35.     If Officers VITELLARO and JESSE OEINCK heard over the radio that Plaintiff was intoxicated, underage, upset, nonviolent and probably heading home they would have likely handled their subsequent interaction differently.

**ANSWER: Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

36.     VITELLARO and OEINCK, by not turning on their blue lights and sirens as they followed Plaintiff to his home, never indicated that they were police officers or interested in initiating a stop.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

37.     Officers VITELLARO and OEINCK followed JUAN FLORES into a dead-end lot next to JUAN FLORES' house.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

38.     VITELLARO and OEINCK did not pull all the way behind JUAN FLORES thereby failing to seal off the only exit from the lot with their vehicle, had they done so FLORES would have been unable to exit the lot.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

39.     VITELLARO and OEINCK both step out of the patrol car.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

40.     VITELLAO and OEINCK never announce or identified themselves as police officers.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

41.     OEINCK was out of the patrol car, standing by his door when he saw the light indicators on JUAN FLORES car move from brake lights to reverse lights.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

42.     OEINCK hesitated as he recognized the potential that JUAN FLORES could potentially try and reverse.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

43.     Without reason, being in full control of his own movements, and of his own free will, OEINCK willfully proceeded to place himself in the path of JUAN FLORES' moving vehicle.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

44.     The only reason that FLORES' vehicle was able to contact OEINCK was because OEINCK willfully placed himself in that position.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

45.     As Plaintiff backed out of the lot, Officer OEINCK, without justification, shot into the car driven by JUAN FLORES hitting JUAN FLORES multiple times, killing him.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

46.     Video of the above, including the shooting were also captured on video tape from at least the dashboard camera in the car occupied by Officers VITELLARO AND OEINCK.

**ANSWER: Defendant City admits the incident is captured on video tape from at least the dashboard camera in the car occupied by Officers Vitellaro and Oeinck.**

47.     JUAN FLORES did not have a gun. Juan Flores' sister witnessed the shooting from her window immediately next door to the vacant lot.

**ANSWER: Defendant City lacks knowledge or information sufficient to form a belief regarding the allegations contained in this paragraph.**

48.     Officer OEINCK violated his duty and training by placing himself in the path of a moving vehicle and failing to move out of the path of the moving vehicle before firing at and into the moving vehicle when the moving vehicle was the only purported threat to the officer or others.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

49.     The CITY, through the Chicago Police Department, and COPA, and pursuant to various Chicago Police Department policies and procedures, conducted a purported investigation of the shooting of JUAN FLORES.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

## <u>COUNT I</u>
**(42 U.S.C. § 1983 – against Officers Vitellaro and Oeinck [*sic*])**

Defendant City makes no answer to count I of plaintiff's second amended complaint. The allegations are directed against Officers McCoy and O'Connor, and the claims against Officers McCoy and O'Connor have been dismissed. See *In re Horizon Group Mgmt., LLC*, 617 B.R. 581, 592 (Bankr. N.D. Ill. 2020) ("The substance of the allegations in a pleading, not the headings or titles, govern the nature of the claim."); (ECF No. 97).

## COUNT II
## STATE COMMON LAW

Defendant City makes no answer to count II of plaintiff's second amended complaint as count II has been dismissed with prejudice. (ECF No. 97).

## COUNT III
## (42.S.C. § 1983 – Fourth Amendment Excessive Force)

60.     Each of the preceding paragraphs is incorporated as if fully restated here.

**ANSWER: Defendant City restates its answers to the above paragraphs as its answer to this paragraph as if fully restated herein.**

61.     Defendant OFFICERS OEINCK and VITELLARO had a duty to not exert excessive force on FLORES.

**ANSWER: Defendant City admits this allegation as to Officer Oeinck only.  Defendant City makes no answer as to Officer Vitellaro as Count III was dismissed with respect to Officer Vitellaro.**

62.     As described above, one or more of the Defendant OFFICERS OEINCK and VITELLARO subjected Decedent FLORES to excessive force in violation of the Fourth Amendment to the United States' Constitution.

**ANSWER: Defendant City denies this allegation as to Officer Oeinck only.  Defendant City makes no answer as to Officer Vitellaro as Count III was dismissed with respect to Officer Vitellaro.**

63.     Defendant OFFICERS' conduct was objectively unreasonable under the totality of the circumstances.

**ANSWER: Defendant City denies this allegation as to Officer Oeinck only. Defendant City makes no answer as to Officer Vitellaro as Count III was dismissed with respect to Officer Vitellaro.**

       64.     As a result of Defendant OFFICERS' acts or omissions, decedent experienced pain, suffering, the loss of his life, and his estate has incurred medical and funeral expenses.

**ANSWER: Defendant City denies this allegation as to Officer Oeinck only. Defendant City makes no answer as to Officer Vitellaro as Count III was dismissed with respect to Officer Vitellaro.**

**COUNT IV**
**STATE COMMON LAW**

Defendant City makes no answer to count IV of plaintiff's second amended complaint as count IV has been dismissed with prejudice. (ECF No. 97).

**COUNT V**
**WRONGFUL DEATH**

Defendant City makes no answer to count V of plaintiff's second amended complaint as count V has been dismissed with prejudice. (ECF No. 97).

**COUNT VI**
**(Violation of Rights Under Illinois Law Against Defendant CITY)**

Defendant City makes no answer to count VI of plaintiff's second amended complaint as count VI has been dismissed with prejudice. (ECF No. 97).

**COUNT VII**
**(STATE LAW INDEMNIFICATION AGAINST DEFENDANT CITY)**

Defendant City makes no answer to count VII of plaintiff's second amended complaint as count VII has been dismissed with prejudice. (ECF No. 97).

## COUNT VIII
## (42.S.C §1983 – MONELL CLAIMS AGAINST CITY)

86.    Plaintiff repeats and re-alleges all paragraphs above as if fully set for herein.

**ANSWER: Defendant City restates its answers to the above paragraphs as its answer to this paragraph as if fully restated herein.**

87.    The Chicago Police Department (the "Department") is a subsidiary division of Defendant, the CITY OF CHICAGO. The CITY maintains and exercises exclusive control over the Department, its policies and procedures, as well as the conduct of all its employees, including Defendants, OEINCK, VITELLARO, MCCOY and O'CONNOR, and their supervisors.

**ANSWER: Defendant City admits the allegations contained in this paragraph. Answering further, there are no claims remaining against Officers Vitellaro, McCoy, and O'Connor. (ECF No. 97).**

88.    The Defendant, CITY, through its subsidiary the Chicago Police Department, has established certain policies and procedures which were adopted and promulgated through the actions and inactions of senior and intermediate supervising officers of the Chicago Police Department, and were thereby ratified by the CITY.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

89.    The municipal policy-makers of  the City of Chicago acted with deliberate indifference in maintaining, overlooking and preserving the unconstitutional practices, policies and customs. By their inaction and failure to correct the above-described practices, policies, and customs, municipal policy-makers tacitly approve and thus indirectly authorize the type of misconduct Plaintiff complains of herein.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

90.    At the time of this occurrence and prior thereto, there existed within the Chicago Police Department policies and procedures which result in the failure to refusal of the Chicago Police Department to properly and legitimately investigate the use of deadly force by sworn Chicago Police Officers against civilian citizens of Chicago.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

91.    The City of Chicago and Chicago Police Department's pattern and practice of failing ore refusing to properly and legitimately investigate the use of deadly force by sown Chicago Police Officers against civilian citizens of Chicago is often referred to as the code of silence.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

92.     Rahm Emmanuel, the Mayor of Chicago at the time JUAN FLORES was killed, acknowledged the Chicago Police Department's code of silence.

**ANSWER: Defendant City admits that, within the context of a larger speech to City Council on December 9, 2015, Mayor Emanuel stated: "The problem is sometimes referred to as the thin blue line. The problem is other times referred to as the code of silence. It is the tendency to ignore, it is the tendency to deny, it is the tendency in some cases to cover up the bad actions of a colleague or colleagues." The City denies all other allegations contained in this paragraph.**

93.     The former Mayor has previously acknowledged the existence of the code of silence in the context of other police shootings found to be unjustified.

**ANSWER: Defendant City admits that, within the context of a larger speech to City Council on December 9, 2015, Mayor Emanuel stated: "The problem is sometimes referred to as the thin blue line. The problem is other times referred to as the code of silence. It is the tendency to ignore, it is the tendency to deny, it is the tendency in some cases to cover up the bad actions of a colleague or colleagues." The City denies all other allegations contained in this paragraph.**

94.     The failure or refusal of the Chicago Police Department to properly and legitimately investigate the use of deadly force by sworn Chicago Police Officers, and the resulting failure of the Chicago Police Department to properly discipline its officers for the illegal use of excessive force, is the proximate cause of frequent injuries to and the death of civilian citizens, including Plaintiff's Decedent, JUAN FLORES.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

95.     At the time of this occurrence and prior thereto, the CITY, through the Chicago Police Department, utilized the Detective Division to ostensibly investigate incidents in which Chicago Police Officers, including fellow members of the Detective Division, use deadly force resulting in death or great bodily injury to civilian citizens. The investigation by Chicago Police Detectives and other Police personnel of the use of deadly force by other Chicago Police Officers, including members of the Detective Division, creates a transparent conflict of interest which improperly influences the investigative process and the decisions that flow therefrom.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

96.     The City of Chicago has encouraged its police department to protect its police officers from accountability. The City has allowed and encouraged a practice whereby Chicago police Detectives are allowed to conduct their interviews of witnesses and accused officers before any investigator from the Police Review Authority (IPRA) is allowed to do so. During their investigations into officer-involved deaths, the Chicago Police Detectives who are assigned to investigated these types of cases steer their investigations of civilian deaths in favor or the accused officers by methods such as dismissing witnesses who are unfavorable to the officers

involved and then not recording these witnesses' presence on scene; by manipulating, lying to, coercing and/or pressuring witnesses into changing their testimony to reflect more favorably upon the officers involved; by recording witness statements inaccurately, by counseling or advising the officers involved in what to say to avoid discipline or liability for their actions; by failing to collect or preserve evidence that would not reflect favorably upon the officers involved; and by misleading prosecutors above the evidence that the police officers are shielded from discipline, liability, and prosecution.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

97.     As a part of its policy or custom of failing to properly or legitimately investigate the use of deadly force by Chicago Police Officers, the Department commonly classifies as "justified" the use of deadly force by Chicago Police Officers under facts and circumstances in which a citizen using deadly force under the same circumstances, would have been charges criminally for the very conduct which is deemed "justified" when committed by a Chicago Police Officer.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

98.     The code of silence has existed inside the Chicago Police Department for decades and Defendant CITY has long been aware of it but has done almost nothing to address or correct this problem until very recently.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

99.     Chicago Police Officers who observe misconduct by their fellow officers but do not report it are not held accountable for their failure to do so.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

100.     Whistleblowers within the Chicago Police Department are not protected or supported by the Chicago Police Department and Defendant CITY. Chicago police officers who report the misconduct of other officers are subjected to unbearable working conditions and are ridiculed and shunned by their fellow officers, thereby discouraging them and other officers from reporting misconduct they observe. Instead of guarding against this treatment of whistleblowers, CPD supervisory staff either participates in it or turns a blind eye to it.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

101.     Thus, Chicago police officers who use excessive force on civilians know they can act with impunity, even if their misconduct is witnessed by their fellow officers.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

102.     The CITY has also been deliberately indifferent to the Chicago Police Department's failure to properly use, maintain, and monitor Chicago police dashboard video and

audio recording equipment. The CITY had failed to supervise its police officers in using this equipment properly, and failed to investigate and discipline instances of officers disabling, destroying, or failing to record save these recordings. Chicago police officers know they can disable the equipment, fail to upload the recordings from their shift, or simply move off camera to commit misconduct, without suffering any discipline or consequences. Thus, as a result of the CITY's deliberate indifference, Chicago police officers who use excessive force are also unconcerned about their misconduct being caught on their police vehicle's recording equipment.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

103.    A principal face of the unlawful policies and customs employed by the CITY is the fact that in many, if not all material respects, the Chicago Police Department investigates the use of deadly force differently, and far less stringently, when a Chicago Police Officer is the one using deadly force, then when it investigates the use of deadly force by a civilian citizen.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

104.    The manner in which the purported investigation of the use of deadly force by Defendants, OEINCK, and the willful and wanton acts of VITELLARO, MCCOY, and O'CONNOR, that unnecessarily lead to the use of deadly force by police officers as compared with investigations of the use of deadly force by citizens. Examples of the disparity in the method and manner of the investigation including the following:

      a.  Despite the fact that Defendants, MCCOY and O'CONNOR had Plaintiff's Decedent who did not have keys to drive and JUAN FLORES was instructed by police to pick up his keys and escorted by police to his car knowing he was afraid and intoxicated and watched JUAN FLORES drive away and that Police Officers MCCOY and O'CONNOR never alerted or notified other police in the area of the type of vehicle or status of JUAN FLORES to de-escalate the situation. Despite the fact that OEINCK and VITELLARO unnecessarily chased JUAN FLORES home and OEINCK shot him when JUAN FLORES had no gun just steps from his home.

      b.  It is believed that the police never presented the evidence and video and audio tapes obtained from their investigation to the States Attorney's Office for an independent evaluation and for consideration of potential criminal charges against Defendants, OEINCK, VITELLARO, MCCOY, and O'CONNOR, as it always done in a shooting by a civilian citizen.

**ANSWER: Defendant City denies the allegations contained this paragraph, including subparagraphs a and b.  Answering further,  there are no claims remaining against Officers Vitellaro, McCoy, and O'Connor. (ECF No. 97)**

105.    According to City of Chicago statistics, since its inception in 2007, the City of Chicago's Independent Police Review Authority (IPRA) has investigated more than 400 police shootings and found the police officers' conduct during these incidents to be justified in almost

every case. Even when IPRA investigators find police officer misconduct, Defendant CITY, through its chosen IPRA supervisors, refused to make findings against Chicago police officers involved in civilian deaths, and have instead ordered IPRA investigators to change their findings and reports to hide police officer misconduct from public scrutiny and oversight.

**ANSWER: To the extent the allegations in this paragraph fail to cite a specific source, Defendant City answers that the allegations are vague and ambiguous, causing Defendant City to lack knowledge or information sufficient to form a belief as to the truth of the statistics set forth in this paragraph. Answering further, Defendant City denies the remaining allegations contained in this paragraph.**

106. Even after a jury found has found that a Chicago police officer has used excessive force on a citizen, Defendant CITY did not impose discipline based on the jury's findings. For example, in 2009. A jury found that Officer Jason Van Dyke had used excessive force on a citizen and awarded that citizen $350,000.00 in damages. Officer Van Dyke was not disciplined as a result of the jury's findings and thus, was led to believe that he could commit acts of excessive force with immunity. Five years later, Van Dyke killed Laquan McDonald. The City of Chicago's Police Accountability Task Force has found that "[the Independent Police Review Authority] is badly broken…Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers. Up until recently, the agency had been run by former law enforcement, who allowed leadership to reverse findings without creating any record of the changes."

**ANSWER: Defendant City admits that that page 14 of the April 2016 Police Accountability Task Force report contains the quoted material in this paragraph "[the Independent Police Review Authority] is badly broken…Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers. Up until recently, the agency had been run by former law enforcement, who allowed leadership to reverse findings without creating any record of the changes." Answering further, Defendant City denies the remaining allegations in this paragraph.**

107. The failure and refusal by the CITY, through the Department, to properly and legitimately investigate the use of the deadly force by sworn Chicago Police Officers, signals a tolerance by the CITY of the improper use of deadly force by Chicago Police Officers, and constitutes a deliberate indifference by the CITY to such conduct.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

108. By its policies of non-feasance and deliberate indifference in the aforementioned areas, the CITY, through the Chicago Police Department, let it be known to its supervisors and officers, such as Defendants, OEINCK, VITELLARO, MCCOY and O'CONNOR, and the CITY, condoned ratified and, by virtue thereof encouraged, the unwarranted and illegal use of deadly force by said officers.

**ANSWER: Defendant City denies the allegations contained this paragraph. Answering further, there are no claims remaining against Officers Vitellaro, McCoy, and O'Connor. (ECF No. 97)**

109.    The failure and refusal by the CITY, through the Department, to investigate the use of deadly force by sworn Chicago Police Officers in the same manner and form, and subject to the same standards, as those used by the Department in its investigations of the use of such force by civilian citizens, creates unwarranted and illegal favored treatment for a class of citizens, Chicago Police Officers, as compared with the treatment afforded civilian citizens.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

110.    Additionally, the CITY failed to properly screen, train, and supervise CPD officers.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

111.    Through CPD's widespread use of excessive force against Chicago civilians, the City have acted recklessly in implementing, allowing, and acquiescing to the existing unconstitutional practices.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

112.    Though being fully aware that the work of a police officer demands extensive training regarding the general order prohibiting the firing into vehicles and officer induced jeopardy, the City failed to properly train police officers regarding the legal and factual bases involved in these orders.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

113.    Though being fully aware that the work of a police officer demands extensive training regarding the general order on use of force, Defendant City failed to properly train police officers regarding the legal and factual basis for using deadly force.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

114.    The city has not only failed to provide adequate training in light of foreseeable consequences but has also failed to act in response to repeated complaints of constitutional violations by its officers. This amounts to deliberate indifference.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

115.    The acts and omissions of the Defendant, the CITY, through the policies and procedures implemented by the Chicago Police Department, were a deliberate and malicious deprivation of JUAN FLORES' Constitutional rights as guaranteed to the Plaintiff's Decedent by

the Fourth Amendment to the Constitution and made applicable to the states by the Fourteenth Amendment.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

116.    As a direct and proximate cause of the wrongful acts of Defendant, CITY, JUAN FLORES, suffered great bodily injury, which resulted in his death.

**ANSWER: Defendant City denies the allegations contained this paragraph.**

## JURY DEMAND

Defendant City demands a trial by jury.

## AFFIRMATIVE DEFENSES

1. Defendant City cannot be held liable for punitive or exemplary damages in any Section 1983 action brought against it directly or indirectly by the injured party or a third party. *City of Newport, et al. v. Fact Concerts, Inc.*, 435 U.S. 247 (1981).

2. Defendant City is not liable to Plaintiff for any federal claim for which its employees or agents are not liable to Plaintiff. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

3. Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened but were not, due to Plaintiff' failure to take reasonable action to minimize those damages.

DATED: August 20, 2021                          Respectfully submitted,

 

                                                                         On behalf of the City of Chicago,
                                                                         Corporation Counsel
                                                                         Celia Meza

                                                       By:    */s/ Andréa L. Campbell*
                                                                         Assistant Corporation Counsel Supervisor
                                                                         Attorney No. 6308694

Brett Kabacinski, Assistant Corporation Counsel  Supervisor
Andréa L. Campbell, Assistant Corporation Counsel Supervisor
City of Chicago Department of Law

Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-8362
(312) 744-6566 (FAX)
*Attorneys for the City of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that, on **August 20, 2021**, I submitted with the Clerk for the Northern District of Illinois using the Court's electronic filing system or CM/ECF **Defendant City of Chicago's Answer to Plaintiff's Second Amended Complaint**, and thereby provided a copy of same by service to all attorneys of record at the electronic addresses they provided to the court.

*/s/ Andréa L. Campbell*
ANDREA L. CAMPBELL
Assistant Corporation Counsel Supervisor